**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and ARTHUR H. BUNTE, JR., Trustee, | )<br>)<br>)<br>) |
| Plaintiffs, | ) |
| | ) No. 11 C 3785 |
| v. | ) Judge Ronald A. Guzmán |
| CLP VENTURE, LLC, JM VENTURE LLC, LATHROP STAR, LLC, NEW CONCORD OHIO INC., PLAIN JAR LLC, RMP-1 VENTURE LLC, GJC, LLC, MAIN STREET LAUNDRY LLC, HAGAR 67, LLC, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Central States, Southeast and Southwest Area Pension Fund ("Central States") and Arthur H. Bunte, Jr. seek to hold the defendants jointly and severally liable for withdrawal liability as a "single employer" under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1301(b)(1). The parties have filed cross-motions for summary judgment. For the reasons stated below, the plaintiffs' motion is granted and the defendants' motion is denied.

**I.    Background**

Central States is a multiemployer pension fund. (Defs.' Resp. Pls.' LR 56.1(a) Stmt., Dkt. # 54, ¶ 3.) During all relevant times, GWT 2005 Inc. f/k/a General Warehouse & Transportation Company ("General Warehouse") was bound by collective bargaining agreements

with a local union under which it was required to make contributions to Central States on behalf of certain of its employees. (*Id.* ¶ 5.) Central States determined that on or about June 3, 2005, General Warehouse permanently ceased: (1) all covered operations under the pension fund; and/or (2) to have an obligation to contribute to the fund. (*Id.* ¶ 6.) As a result of this complete withdrawal, General Warehouse incurred withdrawal liability of over $1.2 million. (*Id.* ¶ 7.) Thus, in a case brought by Central States against General Warehouse and its affiliated entities, captioned *Central States, Southeast and Southwest Areas Pension Fund, et al. v. GWT 2005, Inc., et al.* (N.D. Ill. 06 C 1205) ("the "General Warehouse Lawsuit"), the court entered a consent judgment against the defendants in the amount of $1,715,046.26 for their withdrawal liability, including interest and costs, in favor of Central States. (Pls.' Resp. Defs.' LR 56.1(a) Stmt., Dkt. # 52, ¶¶ 18, 21.) The consent judgment also states that General Warehouse, C&L, Inc. ("C&L"), Geobeo, Inc. ("Geobeo"), and CLP Transportation, Inc. ("CLP") (collectively, the "General Warehouse Group") constitute a single employer by virtue of being part of a group of trades or businesses under common control as defined by 29 U.S.C. § 1301(b)(1). (*Id.* ¶ 18.)

      As of June 3, 2005, the date of General Warehouse's withdrawal, C&L owned at least 80% of the total combined voting power of all classes of stock of General Warehouse entitled to vote and/or at least 80% of the total value of shares of all classes of stock of General Warehouse. (Defs.' Resp. Pls.' LR 56.1(a) Stmt., Dkt. # 54, ¶ 8.) As of June 3, 2005, Geobeo owned at least 80% of the total combined voting power of all classes of stock of C&L entitled to vote and/or at least 80% of the total value of shares of all classes of stock of C&L. (*Id.* ¶ 9.) As of June 3, 2005, Geobeo owned at least 80% of the total combined voting power of all classes of stock of CLP entitled to vote and/or at least 80% of the total value of shares of all classes of stock of

CLP.  (*Id*. ¶ 10.)

The defendants in this case, CLP Venture LLC, JM Venture LLC, Lathrop Star, Ltd., New Concord Ohio, Inc., Plain Jar LLC, RMP-1 Venture LLC, GLC LLC, Main Street Laundry, LLC, and Hagar 67, LLC, are all Illinois limited liability companies or corporations.  (*Id*. ¶¶ 12-20.)  As of June 3, 2005, George J. Cibula ("Cibula") directly or indirectly owned at least 80% of the ownership interest in each of the defendants.  (*Id*. ¶ 20.)

Prior to January 1, 1998, 650 shares of Geobeo stock were held by Cibula and 350 shares were held by Robert Pieranunzi.  (*Id*. ¶ 21.)  On January 1, 1998, Pieranunzi executed a Stock Redemption Agreement with Geobeo.  (*Id*. ¶ 22.)  Pursuant to the Stock Redemption Agreement, the stock certificate containing Pieranunzi's shares was canceled and new stock certificates totaling 350 shares were issued to Patrick Moran, the Treasurer and Chief Financial Officer of Geobeo, as escrowee.  (Pls.' Resp. Defs.' LR 56.1(a) Stmt., Dkt. # 52, ¶¶ 24, 26.)  The shares were to be held in escrow by Moran until certain installment payments were made by Geobeo to Pieranunzi.  (*Id*. ¶ 26.)  At the time that Geobeo made an installment payment to Pieranunzi as required by the Stock Redemption Agreement, a stock certificate representing a certain number of Geobeo shares would be transferred from escrow to Geoebeo.  (*Id*. ¶¶ 27-29.)

The Stock Redemption Agreement provided that shares in escrow shall be voted as follows:

> (v) In the event the Escrowee receives a written Notice of an alleged default under this Agreement claimed by either Seller or Buyer, Escrowee shall hold any Certificates then in its possession until it receives either (a) a court order directing it to comply with this Agreement of (b) a written direction executed by both Seller and Buyer directing it to comply with this Agreement;
> (vi) So long as there is no alleged default in existence, the Escrowee shall vote any shares in his possession in accordance with the written instructions of the Buyer. If Notice of an alleged default is received by Escrowee, then Escrowee

3

shall abstain from voting any shares in its possession.

(Defs.' Resp. Pls.' LR 56.1(a) Stmt., Dkt. # 54, ¶ 23.)

An amendment to the Stock Redemption Agreement was made on January 1, 1998. (Pls.' Resp. Defs.' LR 56.1(a) Stmt., Dkt. # 52, ¶ 31). One more payment was made to Pieranunzi in April 2001, but, by letter dated April 8, 2002, Geoebeo received notice of default from Pieranunzi's attorney. (*Id.*¶¶ 32-33.) On July 19, 2004, Pieranunzi and Cibula executed an Assignment of Promissory Note pursuant to which Cibula purchased all of Pieranunzi's rights to Geobeo's stock. (Defs.' Resp. Pls.' LR 56.1(a) Stmt., Dkt. # 54, ¶ 27.)

Additional facts will be discussed as necessary in the Analysis section of this order.

## II. Analysis

### A. General Statutory Background

The Multiemployer Pension Plan Amendments to the Employee Retirement Income Security Act (MPPAA) provide that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a). The statute imposes withdrawal liability to a withdrawing employer "so that the financial burden of his employees' vested pension benefits will not be shifted to the other employers in the plan and, ultimately, to the Pension Benefit Guaranty Corporation, which insures such benefits." *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir. 1992). Under the MPPAA, "all trades or businesses under common control are treated as constituting a single employer for purposes of determining withdrawal liability." *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 876 (7th Cir. 2011); 29 U.S.C. § 1301(b)(1).

Thus, two entities will be considered a single employer if they are (1) trades or businesses and (2) under common control. *McDougall v. Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 577 (7th Cir. 2007).

In their summary judgment motion, the plaintiffs contend that the defendants are jointly and severally liable for the withdrawal liability of the defendants in the General Warehouse Lawsuit because they are under common control. As part of this conclusion, the plaintiffs assert that the defendants are all "trade or businesses" as that term is used in the MPPAA. The defendants cross-move for summary judgment arguing to the contrary.

    B.    Common Control

In determining whether businesses are under common control, "the [Pension Benefit Guarantee Corporation ('PBGC')] has adopted the language set forth in Section 414(c) of the Internal Revenue Code, which identifies both 'parent-subsidiary' and 'brother-sister' organization groupings as forms of common control." *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 738 F. Supp. 2d 840, 846 (N.D. Ill. 2010) (citing 26 C.F.R. § 1.414(c)–2). As noted by the district court in *SCOFPB*,

> a 'parent-subsidiary group' is one in which one or more 'chains of organizations' are connected through a common controlling interest (80 percent of the stock). A 'brother-sister group' is one in which (1) 'five or fewer persons who are individuals, estates, or trusts' own a controlling interest (at least 80 percent of the stock) in two or more organizations and (2) the same persons maintain 'effective control' (at least 50 percent of the stock) over each organization.

*Id*. (internal citation omitted).

In addition, a "combined group" is defined by the Treasury regulations as:

> any group of three or more organizations, if (1) each such organization is a member of either a parent-subsidiary group of trades or businesses under common control or a brother-sister group of trades or businesses under common control,

5

> and (2) at least one such organization is the common parent organization of a parent-subsidiary group of trades or businesses under common control and is also a member of a brother-sister group of trades or businesses under common control.

26 C.F.R. § 1.414(c)-2(d).

Finally, a "controlling interest" means:

> In the case of an organization which is a corporation, ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation.

26 C.F.R. § 1.414(c)-2(b)(2)(A).

According to the plaintiffs, the defendants in this case are part of a combined group of trades or business under common control with General Warehouse. Specifically, the plaintiffs contend that Geobeo is both the parent organization in the General Warehouse Group (a parent-subsidiary group) and a member of the brother-sister group which includes Geobeo and the defendants in this case. Thus, the plaintiffs assert, the entire "combined group" is jointly and severally liable for the General Warehouse withdrawal liability.

The defendants, however, contend that the plaintiffs cannot establish the existence of a brother-sister group comprised of the defendants in this case and Geobeo because there is no common control between the defendants and Geobeo. While it is undisputed that Cibula owns 80% of each of the defendants, they argue that the plaintiffs have not established that Cibula owns at least 80% of the voting shares of Geobeo.

The parties agree that the determinative factor with respect to the common control issue is whether Cibula owned at least 80% of the voting shares of Geobeo. Therefore, the Court moves on to consider the parties' positions with respect to this issue.

<u>Defendants</u>. The defendants' contention that Cibula did not own 80% of Geobeo voting

stock rests on their position that because several payments were not made by Geobeo under the Stock Redemption Agreement, a default was entered and the remaining shares held by the escrowee were never transferred to Geobeo. As a result, the defendants contend, Cibula's ownership interest in Geobeo never exceeded 73% (1000 shares originally outstanding - 112 redeemed before default = 888 shares outstanding, so Cibula's ownership was 650/888 = 73.2%[1]). (Pls.' Resp. Defs.' LR 56.1(a) Stmt., Dkt. # 52, ¶ 36.)

Plaintiffs.[2] For their part, the plaintiffs contend that the while the defendants argue that more than 20% of Geobeo stock was held in escrow and thus Cibula could not have owned at least 80% of Geobeo stock, Moran never had voting control of the stock in escrow. According to the plaintiffs, under the Stock Redemption Agreement, the escrowee was required to either (1) vote the stock at the direction of Geobeo (which was under the control of Cibula), or (2) abstain from voting the stock altogether. (Defs.' Resp. Pls.' LR 56.1(a) Stmt., Dkt. # 54, ¶ 23.) Because

---

[1] Had the payments been made as provided in the Stock Redemption Agreement, 350 shares would have been redeemed, thus giving Cibula ownership of 100% of Geobeo's outstanding stock.

[2] The plaintiffs assert that other documents establish that Cibula owned at least 80% of Geobeo. First, they point out that the 2004 tax returns for Geobeo indicate that Cibula owned 100% of Geobeo stock. But, Patrick Moran, as the Treasurer and Chief Financial Officer of Geobeo (*id.* ¶ 24), disputes the accuracy of the returns. (Moran Dep., Defs.' Ex. D at 37-39, 50-52.) Because a genuine issue of material fact exists as to whether the share ownership indicated in Geobeo's 2004 tax return is accurate, this basis for granting summary judgment to the plaintiffs is denied.

Next, the plaintiffs refer to Geobeo's 2004 Annual Report, which states that there were only 650 shares of Geobeo stock outstanding. (Pls.' Ex. 7.) According to the plaintiffs, this statement shows that Geobeo itself considered the 350 shares once owned by Pieranunzi as no longer outstanding with Cibula retaining 100% ownership in the 650 shares outstanding. Again, however, because Moran disputes the accuracy of the statement in the annual report, the Court cannot grant summary judgment on this ground.

Geobeo was in default, the escrowee was required to abstain from voting. (*Id.*) Thus, the shares in escrow ceased to be "shares entitled to vote" and Cibula owned 100% of the outstanding voting stock from the date of default, which was in April 2002.

In addition, pursuant to the Assignment, which occurred on July 19, 2004, Pieranunzi relinquished any rights he had in the Geobeo stock. As is relevant here, the Assignment provided that:

> 4. Assignor [Pieranunzi] does hereby transfer and assign to Assignee [Cibula] all rights Assignor has or holds as the secured party by virtue of the security interest in Assignor's Shares created by the Stock Redemption Agreement and the Note, including the right to demand a transfer from Geobeo to Assignor of Assignor's Shares in the event of a default under the Note. . . .
>
> 5. Assignor hereby relinquishes, waives and releases any rights which Assignor may have under the Stock Redemption Agreement.

(Defs.' Resp. Pls.' LR 56.1(a) Stmt., Dkt. # 54, ¶ 27.)

Thus, regardless of the status of the stock in escrow, Cibula acquired all of Pieranunzi's interest in Geobeo stock, including the rights to the stock held in escrow, and he did so on July 19, 2004, before the date of withdrawal of June 2005. Accordingly, the Court finds that the plaintiffs have established that Cibula had at least 80% ownership of Geobeo's shares.

The defendants' arguments to the contrary are unavailing. First, they state that in the Assignment, Pieranunzi only assigned to Cibula "his rights in the promissory note." (Defs.' Resp. at 6.) But this ignores the express language of the assignment which provides that Pieranunzi transferred any rights he had as a result of the Stock Redemption Agreement and Note, "including the right to demand a transfer from Geobeo to Assignor [Pieranunzi] of Assignor's Shares in the event of a default under the Note." (Defs.' Resp. Pls.' LR 56.1(a)

8

Stmt., Dkt. # 54, ¶ 27.) Moreover, the Assignment goes on to provide that Pieranunzi "relinquishes, waives and releases any rights" he has under the Stock Redemption Agreement. (*Id.*) Thus, Cibula obtained all rights to the Geobeo stock and Pieranunzi retained no ownership or reversionary rights.

The defendants also assert that no demand was ever made, presumably by Cibula, to transfer the shares held in escrow and, similarly, that Cibula never owned or voted the shares. But, as noted by the plaintiffs, the relevant regulations provide that "[i]f a person has an option to acquire any outstanding interest in an organization, such interest shall be considered owned by such a person." 26 C.F.R. § 1.414(c)-4(b)(1). Accordingly, it was Cibula's right to acquire the stock that mattered, not that he exercised that right. Cibula acquired the ownership rights to Pieranunzi's stock through the July 2004 Assignment. Thus, to the extent that Moran held the stocks in escrow, he did so for the benefit of Cibula.

Because Cibula had ownership rights to all of the voting stock of Geobeo, the defendants are part of a combined group of trades or businesses under common control and therefore are jointly and severally liable for the withdrawal liability of General Warehouse.

C. <u>Trade or Businesses</u>

The defendants next argue that they are not trades or businesses as required to hold an entity jointly and severally liable for withdrawal obligations. "For an activity to be a trade or business . . . , a person must engage in the activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity." *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895 (7th Cir. 2001). "One purpose of th[is] . . . test is to distinguish trades or business from investments, which are not trades or business and thus cannot form a

basis for imputing withdrawal liability. . . ." *Id.*; *see also SCOFPB*, 668 F.3d at 878 ("These criteria are intended to distinguish a trade or business from investments, hobbies, or 'amusement diversion[s].'") (quoting *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987)). The Court notes at the outset that, according to the Seventh Circuit, "because formal business organizations ordinarily operate with continuity and regularity and are ordinarily formed for the primary purpose of income or profit, it seems highly unlikely that a formal for-profit business organization would not qualify as a 'trade or business' under the *Groetzinger* test." *Id.*

For their part, the plaintiffs assert that the defendants were created to actively lease property and equipment. Cibula acknowledges in his affidavit that CLP Venture, JM Venture, New Concord and Plain Jar "had the . . . purpose of holding commercial real estate for rent." (Cibula Aff., Dkt. # 48-8, ¶¶ 1, 3, 7, 9.) Moreover, CLP Venture, JM Venture, Hagar 67, and Plain Jar all state in their operating agreements that the business of the companies was to "own, lease, operate, finance, refinance and dispose of real estate . . . ." (Defs.' Resp. Pls.' LR 56.1(a) Stmt., Dkt. # 54, ¶¶ 31, 34, 36, 42.) CLP Venture filed a U.S. Return of Partnership Income for 2005 under its Federal Employer Identification Number ("FEIN"), which reported its principal business activity as "real estate" and its principal product of service as "rental." (*Id.* ¶ 30.) It took business deductions in 2005 of $713,527.00 including legal and other professional fees, repairs, insurance, interest, and management fees. (*Id.*) Hagar 67's balance sheet for 2007 included professional fees of $15,000.00, as well as advertising expenses, and taxes and insurance, among other things. (*Id.* ¶ 33). JM Venture filed a U.S. Return of Partnership income for 2005 under its FEIN, which reported its principal business activity as "real estate" and its principal product or service as "rental." (*Id.* ¶ 35.) It took total business deductions that year,

including legal and other professional fees, advertising, commissions, repairs, insurance, and management fees, among other things, of $455,244.00. (*Id.* ¶ 35.) Lathrop Star filed a federal income tax return in 2005 under its FEIN, which reported its business activity as "rental" and its product or service as "equipment – wholesale." (*Id.* ¶ 37.) During 2005, it sold over 50 forklifts and several other pieces of equipment with an adjusted basis of $1.2 million. (*Id.*) Also in 2005, it took business deductions for legal and other professional fees, advertising, interest and taxes, among other things, in the amount of $232,000.00. (*Id.*)

Main Street Laundry, L.L.C. filed a U.S. Return of Partnership Income for 2004 under the FEIN and reports its principal business activity as "coin operated laundry" and principal product or service as "dry cleaning." (*Id.* ¶ 38.) It further reported ordinary business income of $18,332.00. (*Id.* ¶ 38.) Main Street was involuntarily dissolved by the Illinois Secretary of State on October 28, 2006. (*Id.* ¶ 39.) RMP-1 Venture LLC's operating agreement states that the business of the company is to "engage in the ownership and operation of improved real estate." (*Id.* ¶ 44.) Its balance sheet for 2005 showed miscellaneous expenses of $250,000.00. New Concord filed a federal income tax return in 2005 under its FEIN that reported its "business activity" as "rental" and its product or service as "real estate." (*Id.* ¶ 40.) New Concord's tax return reported that it sold real estate and "equipment" for over $18.5 million for a taxable profit of over $8 million. (*Id.*) It also reported "gross rents" of $1.7 million from which it deducted professional fees, advertising, repairs, insurance, interest as well as management fees of $199,185.00. (*Id.*) Plain Jar's balance sheet and income statement for 2005 indicated "net rental income" of $783,597.00 and "total operating expenses" of $231,000.00 including advertising and management fees. (*Id.* ¶ 41.)

11

According to the defendants, however, their businesses were all passive investments for Cibula including: (1) real estate holding companies (CLP Venture, JM Venture, New Concord, Plain Jar); (2) lessors of equipment (Lathrop Star, RMP-1 Venture); and (3) and the operator of a coin operated laundry (Main Street).[3] The defendants assert that the entities had no employees (Defs.' LR 56.1(a) Stmt., Dkt. # 48-2, ¶ 47), Cibula spent less than 10 hours per year on activities for these entities (*id*. ¶¶ 40-47), with the exception of Main Street, the entities did not maintain or manage the properties or equipment they owned (*id.*), and Main Street was no longer conducting business as of the date of withdrawal in 2005. (*Id*. ¶ 46.) In support, they point to the *Fulkerson* case, in which the Fulkersons argued that their holding of rental property constituted a passive investment because they devoted little time to managing the rental properties and the tenants paid their own maintenance, taxes and insurance. *Fulkerson*, 238 F.3d at 895. The Seventh Circuit reversed the district court's grant of summary judgment to the pension fund on the ground that a reasonable factfinder could conclude that the Fulkerson's leasing activities did not constitute a trade or business. *Id*. at 896-97.

As an initial matter, the Seventh Circuit has referred to the situation in *Fulkerson* as "unusual" and one which "tested the 'outer bounds' of the personal investment concept." *SCOFPB*, 668 F.3d at 879. Moreover, the situation of the defendants here mirrors that of the defendants in *SCOFPB*, in which the Seventh Circuit affirmed the finding that a limited liability company was a "trade or business" despite having no permanent employees because it was a for-profit LLC, earned rental income, paid business management fees, claimed business-related

---

[3] The defendants fail to discuss Hagar 67, LLC or GLC, LLC in their briefing on the motion for summary judgment as to the trades or businesses issue. Nevertheless, the Court finds that they are trades or businesses for the reasons stated herein.

business deductions, applied for and was given an FEIN, and contracted with professionals to provide legal and other services. As in *SCOFPB*, each of the property leasing defendants in this case is an active, formally organized business which applied for and received FEINs, paid management fees and hired professionals to conduct the operations of the business.

Further, in 2005, CLP Venture, JM Venture, Lathrop Star, New Concord and Plain Jar collectively claimed over $3.5 million in business deductions. *Cent. States Se. & Sw. Areas Pension Fund v. Personnel, Inc*., 974 F.2d 789, 795 (7th Cir. 1992) (claiming deductions from business expenses is "strong evidence" that real estate activities constituted a trade or business). In addition, they expressed an intent in their operating agreements to form a business, the purpose of which was to "own, lease, operate, finance refinance and dispose of real estate." (Defs.' Resp. Pls.' LR 56.1(a) Stmt., Dkt. # 54, ¶¶ 31, 32, 34, 36, 42, 44.) *See SCOFPB*, 668 F.3d at 877 (noting that two limited liability companies at issue had operating agreements detailing the type of business they intended to conduct). Indeed, New Concord and Plain Jar produced over $2 million in rental income in 2005. (Defs.' Resp. Pls.' LR 56.1(a) Stmt., # 54, ¶¶ 40-41). Moreover, to the extent that the defendants assert that they did not manage or maintain property, this position is contradicted by the uncontroverted evidence, which shows that CLP Venture, JM Venture, New Concord and Plain Jar all paid "management fees" in 2005 and that these same entities paid over $65,000.00 in "repairs" in 2005. (*Id*. ¶¶ 30, 35, 40, 41.)

As to Main Street Laundry, the defendants make no specific argument that a coin-operated laundry is not a business. While not specifically arguing this in their brief, the Cibula affidavit, upon which the defendants rely, states that Main Street ceased business operations in 2004, before the date of withdrawal in 2005. However, it is undisputed that the Illinois Secretary

13

of State did not dissolve the company until October 28, 2006 (Defs.' Resp. Pls.' LR 56.1(a) Stmt., Dkt. # 54, ¶ 39), and the Cibula affidavit itself states that Main Street Laundry "had the sole purpose of operating a coin laundry facility in *2005 and thereafter*." (Cibula Aff., Dkt. # 48-1, ¶ 15) (emphasis added.)

With respect to the equipment leasing companies specifically, Lathrop Star and RMP-1 Venture, several courts have noted that equipment leasing constitutes a trade or business. *Connors v. Hi-Heat Coal, Co.*, 772 F. Supp. 1, at *6 (D.D.C. 1991) (leasing equipment a trade or business); *Cent. States Se. & Sw. Areas Pension Fund v. Skyland Leasing*, 691 F. Supp. 6, 11 (W.D. Mich. 1987) (equipment leasing operation was a trade or business even though it had no employees).

Finally, Cibula's statement in his affidavit that he spent no more than 10 hours per year on activities related to each defendant's business in 2005 and thereafter (Cibula Aff., Dkt. # 48-8, ¶¶ 2, 4, 6, 8, 10, 12, 14, 16), does not alter the Court's conclusion. While the number of hours spent on a business can give some indication of whether the entity at issue is a trade or business or an investment, *Fulkerson*, 238 F.3d at 896, the fact does not preclude summary judgment here. In *Fulkerson*, one factor that the Fulkersons raised in arguing that their other companies were not trades or businesses was that the husband spent less than five hours per year on the leasing activities. *Id*. The Seventh Circuit expressly noted that "[i]n making this decision [*i.e.*, reversing and remanding], we are mindful that § 1301(b)(1) was not intended to impose automatic *personal* liability on individuals who own companies that are required to contribute to pension funds." *Id*. (emphasis added).

Here, however, the defendants are not individuals but formal business entities which,

14

based on the evidence, lease property or equipment, file tax returns, report rental revenue and paid outside contractors, legal and otherwise, to manage them. As detailed above, these facts establish that they are trades or businesses. In light of the substantial evidence discussed above that the defendants were trades or businesses, Cibula's affidavit that he, a non-defendant, spent less than 10 hours per year on each business, fails to create a genuine issue of material fact on the issue.

For these reasons, the Court finds that no genuine issue precludes summary judgment on the conclusion that the defendants are trades or businesses.

## III. Conclusion

For the reasons stated above, the plaintiffs' motion for summary judgment [49-1] is granted and the defendants' motion for summary judgment [48-1] is denied. Civil case terminated.

**Date**: December 21, 2012

_____
**Ronald A. Guzman**
**United States District Judge**

15